**NOT FOR PUBLICATION**                                                                **CLOSED**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

PAUL L. GROSS and LOUIS C. MEYER, JR.

                Plaintiffs,

    -v-                                   CIVIL ACTION NO. 03-1568 (JAP)

LAWYERS TITLE INSURANCE              **OPINION**
CORPORATION, a Virginia corporation,

                Defendants.
_____

Appearances:

THOMAS J. LaCONTE
DAMIEN L. ALBERGO
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-800
       Attorneys For Plaintiffs

MICHAEL R. GRIFFINGER
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, NJ 07102-5496
       Attorney for Defendants

HARRY M. JOHNSON, III
Hunton & Williams LLP
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia 23219
       Attorney for Defendants, Admitted Pro Hac Vice

PISANO, District Judge:

The Court conducted a two-day bench trial on February 28 and March 1, 2005, after which the parties submitted proposed findings of fact and conclusions of law. After careful review, the Court finds and concludes as follows, and rules in favor of the Plaintiffs.

I.      FINDINGS OF FACT

    A.      Formation of NIA/Lawyers Title

Plaintiffs, Louis C. Meyer, Jr. ("Meyer) and Paul L. Gross ("Gross"), are former equal owners and sole shareholders of NIA Title Agency, Inc. ("NIA"), a New Jersey corporation that sold title insurance. (Meyer Direct, Tr. 11:19-22). Defendant is Lawyers Title Insurance Corporation ("LTIC"), a national company in the business of underwriting and selling title insurance. LTIC operated nationwide, and used independent local agencies in New Jersey to provide title insurance for clients with properties located in the state. LTIC also operated a few of its own offices in New Jersey, but the majority of its business was done through independent agencies. NIA was one such local title insurance agency. (Meyer Direct, 14:20-15:1).

NIA was interested in expanding its operations, so Meyer, who spent eight years working for LTIC, including service as their New Jersey counsel, contacted them to discuss possible opportunities for expansion. (Meyer Direct, 9:6-10:15; 14:20-15:11; Gross Direct, 206:16-24). Meyer entered into discussions with Charles Keith ("Keith"), then LTIC's Senior Vice President for the Northeast Region, who asked if NIA would be interested in taking over LTIC's two remaining New Jersey branch offices. (Meyer Direct, 16:4-7).

On July 1, 1997, NIA and LTIC formed a title insurance agency called NIA/Lawyers Title Agency, LLC ("NIA/Lawyers Title" or the "Company" or the "LLC"). Each party owned a 50%

2

interest in the Company. (Meyer Direct, 12:5-7). The Company was governed by an Operating Agreement negotiated by Janet Alpert ("Alpert") and Keith of LTIC, and Meyer on behalf of NIA. (Meyer Direct, 12:8-13:17).

    One of LTIC's local agencies suffered from poor management and low profitability, so LTIC stood to benefit from its affiliation with NIA, who would take over management of the local branches. (Meyer Direct, 16:9-20; Gross Direct, 207:2-21; Alpert Direct, 286:16-287:2). NIA stood to benefit from taking on LTIC's New Jersey offices because it would expand its New Jersey operations, eliminate competition with LTIC's two New Jersey offices, and gain access to LTIC's stream of national business - business generated outside of New Jersey but involving in-state commercial properties. (Meyer Direct, 16:24-17:11; 20:1-12; Gross Direct, 210:6-15, 214:5-19). The national business LTIC directed into New Jersey consisted of transactions involving commercial properties, which brought higher premiums than small business and residential properties. NIA had received some national business in the past, but just as one of many LTIC agents in New Jersey. (Meyer Direct, 23:25-24:3; Gross Direct, 212:16-213:3). Through the merger, however, NIA sought to *guarantee* itself a percentage of national business. (Meyer Direct, 24:5-21). This meant that when LTIC national division representatives needed to obtain title insurance in New Jersey, the representatives would be *required* to place a specified percentage of that national business with the newly-formed LLC. This percentage was an important aspect of the negotiations leading up to the Operating Agreement. (Meyer Direct, 20:8-12, 24:5-21). In fact, Gross testified "there would be no reason for merging" if LTIC did not agree to allocate national business to the newly-formed company. (Gross Direct, 213:7-14). The allocation is contained in section 5.3 of the Operating Agreement. (Joint Trial Exhibit

3

("Exhibit"), J-3).

Section 5.3 of the Operating Agreement is central to this dispute. It begins with an explanation of New Jersey National Division Business:

> "New Jersey National Division Business"- LTIC and its affiliates from time to time are engaged to perform title services and issue title insurance policies in states and jurisdictions other than the State of New Jersey which involve properties located in the State of New Jersey ("New Jersey National Division Business"). New Jersey National Division Business shall be deemed not to include the performance of title services and the issuance of title insurance policies for properties located in counties serviced by LTIC Acquired Direct Business Operations.

(Exhibit, J-3).

Section 5.3(a), titled "Percentage Average Allocation," provides that LTIC "shall allocate and direct an average of seventy-five percent (75%) of the New Jersey National Division Business to the Company. . . ." (*Id.*). Accordingly, the parties agreed on a 75% referral obligation.

### B.     The Major Transaction Opportunity

Another important aspect of the contract negotiations involved LTIC's intention to pursue national acquisition efforts. (Meyer Direct, 26:1-4, 31:13-19). The parties needed to determine how LTIC's national business referral obligation would be affected by such an acquisition, especially if the acquired company also had direct agencies of its own in New Jersey. LTIC wanted to protect its investment in any acquired company that had substantial business in New Jersey. NIA's main concern was that it protect its entitlement to 75% of LTIC's national business. (Alpert Direct, 284:22-285:8).

Thus, the parties negotiated sections 5.3(a)(i)-(iii), which were designed to protect the integrity of the allocation should LTIC consummate a "Major Transaction Opportunity" - defined

4

in section 5.1(c)(ii) as a merger or acquisition of "any other title insurance company which has business operations in more than one state." (Exhibit, J-3). Section 5.3(a)(i) states that if LTIC consummated "a Major Transaction Opportunity, *the Company shall thereafter only be entitled to [75%] of the New Jersey National Division Business attributable to LTIC* . . . and not the New Jersey national division business of the applicable Major Transaction Party as long as the direct operations of LTIC and the applicable Major Transaction Party in New Jersey are not combined." (*Id.* (emphasis added)). Essentially, the Company would continue to receive 75% of LTIC's New Jersey National Division Business, but it would not be entitled to any national business of the acquired company. (Meyer Direct, 36:20-37:9). Section 5.3(a)(ii) elaborates on a specific formula to preserve the appropriate 75% allocation after consummation of a Major Transaction Opportunity:

> [a]s soon as is reasonably practicable . . . LTIC shall provide a certificate to the Board of Directors which shall set forth (1) the total premium amount of the New Jersey National Division Business for the prior four (4) calendar quarters (the "LTIC New Jersey National Division Amount"), and (2) the total premium amount of the New Jersey national division business . . . of the applicable Major Transaction Party for the prior four (4) calendar quarters (the "Non-LTIC New Jersey National Division Business Amount"). From and after the consummation of a Major Transaction Opportunity, the amount of New Jersey National Division Business that will be referred and allocated to the Company shall be determined by first multiplying the total amount of New Jersey national division business of LTIC and its affiliates (including that of the applicable Major Transaction Party) by the percentage that the LTIC New Jersey National Division Business Amount is of the total of the LTIC New Jersey National Division Amount and the Non-LTIC New Jersey National Division Business Amount, and by then multiplying that product by the [75%].

(Exhibit, J-3; *see also* Meyer Direct, 41:17-42:7).

Under section 5.3(a)(iii), if LTIC did combine its direct operations in New Jersey with that of a Major Transaction Party, "then the amount of New Jersey National Division Business

that will be referred and allocated to the Company shall be determined by multiplying the total amount of New Jersey national division business of LTIC and its affiliates (including that of the applicable Major Transaction Party) by the [75%]." Finally, Section 5.3(c) provides that within thirty days of the close of the prior month, LTIC must deliver to the Company a certificate certifying "the percentage of the aggregate of all New Jersey National Division Business (as measured by the amount of premiums that are collected from the same) that was completed during such calendar quarter and that was allocated and directed to the Company . . . ."[1]

On February 28, 1998, about eight months after LTIC and NIA formed the Company, LTIC consummated a Major Transaction Opportunity. (Alpert Direct, 308:3-24). LTIC's holding company, Lawyers Title Corporation ("LTC"), acquired Commonwealth Land Title Insurance Company ("Commonwealth") and Transnation Title Insurance Company ("Transation") for approximately $400,000,000 (the "Commonwealth Transaction"). (*Id.*). As a result of the acquisition, LTC changed its name to LandAmerica Financial Group, Inc. ("LandAmerica"). Commonwealth had offices in New Jersey, but LTIC remained a separate entity and did not combine its operations with Commonwealth in New Jersey. (Meyer Direct, 31:25-32:1-3; 89:3-18).

    C.    **The Allocation Problem**

In August 2000, Meyer developed the belief that the Company was not receiving its

---

[1] 5.3(b), which gives LTIC sole discretion to determine which specific segments of national division business are allocated to the Company, is of no significance to the instant dispute.

proper allocation of LTIC New Jersey National Division Business. (Meyer Direct, 57:10-23).[2] Instead, the LTIC national division offices were sending a significant amount of New Jersey National Division Business to Commonwealth's branch in Summit, New Jersey. (Meyer Direct, 57:16-23, 66:23-67:3). According to Meyer, LTIC received a more favorable share, or "split," of the gross premiums on business sent to Commonwealth (70%) than on business sent to NIA/Lawyer's Title (50%). (Meyer Direct, 59:10-21). Meyer expressed his concern in an August 22, 2000, e-mail to Don Weigel, then Executive Vice President of LandAmerica. (Exhibit, J-21). Wiegel then e-mailed Jeff Selby ("Selby"), head of LTIC's National Commercial Sales Group, stating, in part, "frankly we are in violation of our contract (pre-merger) with NIA in which we agreed to give NIA 75% of the Lawyers Title Referrals in New Jersey." (*Id.*). On August 23, Selby replied that he changed the Referral Manual "so that NIA will appear as the only choice for all counties in New Jersey," except Camden and Gloucester, which had exclusive agent relationships.[3] (*Id.*).

On December 14, 2000, Meyer sent an e-mail to Wiegel and Alpert, to voice frustration over a long-standing order that was cancelled and instead referred to the Commonwealth office. (Exhibit, J-20). Meyer included Alpert on the e-mail because they had a good working relationship and Alpert was President of LandAmerica. (Meyer Direct, 68:9-21). Meyer

---

[2] As of August 2001, the Company had yet to receive the certification of national division business required under section 5.3(c). (Meyer Direct, 78:7-11; 62:11-15).

[3] Based on these e-mails, Plaintiffs ask the Court to conclude that LTIC admitted its breach of the Operating Agreement. (Plaintiff's Proposed Findings of Fact and Conclusions of Law, 15-16). The Court, however, will not consider Weigel's e-mail as a binding admission that can be imputed to LTIC. Weigel had limited involvement with the Company and played no part in negotiating the Operating Agreement.

7

acknowledged that although the "split" with Commonwealth was more favorable, the LLC had an agreement in place with an allocation requirement. (*Id.*). Meyer concluded that he had yet to see a certification of national division business required under section 5.3(c). (*Id.*). Wiegel responded the next day, stating that after some "preliminary checking . . . the LTIC referral deals that went to NJ are just about in compliance with the contract." (*Id.*).

Meyer wrote to Wiegel and Alpert again on April 12, 2001, charging LTIC with "what appears to be a continuing breach of the terms of the operating agreement." (Exhibit, J-14). Meyer was still concerned that the Company was not receiving its proper allocation of New Jersey National Division Business, noting specifically that it had not received any national business from the New York office. (*Id.*). Moreover, Meyer expressed concern that the Company still had not received a section 5.3(c) certification. (*Id.*).

### D. The "Serviced Counties" Exclusion

On November 8, 2001, Alpert responded to Meyer's concerns for the first time. (Exhibit, J-15). In her opinion, LTIC had over-allocated to NIA/Lawyer's Title. (*Id.*). Alpert attached a spreadsheet[4] detailing LTIC's rationale. LTIC believed after a Major Transaction, the "counties serviced" exclusion took effect, meaning that the total value of New Jersey National Division Business was calculated by excluding the business referred to properties located in "counties serviced" by Commonwealth and Transnation.[5] (Exhibit, J-15; Exhibit, J-19). The spreadsheet

---

[4]The spreadsheet represented the first time the Company had received any type of formal breakdown of the allocation system from LTIC. (Meyer Direct, 87:10-17).

[5]The "counties serviced" exclusion is the second sentence of section 5.3, which states, "New Jersey National Division Business shall be deemed not to include the performance of title services and the issuance of title insurance policies for properties located in counties serviced by LTIC Acquired Direct Business Operations."

indicated that Commonwealth "serviced" twelve of the twenty-one counties in New Jersey. (Exhibit, J-15). Thus, the Company would only be entitled to 75% of LTIC's 57.7% share of New Jersey National Division Business located in the nine remaining counties. Under that interpretation, the spreadsheet revealed that as of the third quarter of 2001, LTIC had over-allocated to the Company by $386,293. (Exhibit, J-15).

Under 5.3(a) the Company was entitled to 75% of LTIC's New Jersey National Division Business. 5.3(a)(i) provided that if LTIC acquired or merged with another company, such as Commonwealth, the Company would still be entitled to 75% of LTIC's share of the New Jersey National Division Business. To calculate LTIC's share, the agreement required LTIC to calculate the total amount of New Jersey National Division Business from the previous four quarters (prior to the merger) for both entities. For instance, if LTIC totaled $60 in premiums and Commonwealth totaled $40, then LTIC's share would be 60%. Moving forward post-acquisition, the allocation would be determined by multiplying LTIC's share by the total amount of combined national division business, and then multiplying that by 75%. So if LTIC and Commonwealth totaled $1,000 in business post-acquisition, LTIC's share would be $600 (60%), of which the Company would be entitled to 75%, or $450. In this hypothetical case, the Company would be allocated 75% of 60%, or 45% of LTIC's New Jersey National Division Business, post-acquisition.

In the case at bar, LTIC's share of New Jersey National Division Business was 57.7%, so the Company was entitled to 75% of that, or 43.275%. The parties do not dispute this. (Meyer Direct, 95:4-96:4; Exhibit, J-16). The dispute lies in LTIC's calculation of the post-acquisition

9

New Jersey National Division Business.  Meyer responded to Alpert on January 8, 2002, objecting to Alpert's interpretation of section 5.3.  (Exhibit, J-16).  Alpert was persistent, explaining LTIC's position in a March 15, 2002 letter:

> To apply the formula, it is necessary to determine what constitutes 'New Jersey National Division Business.'  While I hear Lou [Meyer] when he says he did not focus on the wording of the second sentence of Section 5.3, it clearly says to us that New Jersey National Business does not include business involving properties in counties *serviced* by Commonwealth, the 'LTIC Acquired Direct Business Operations.'  If we had meant to limit the language to counties in which Commonwealth has an office, we would have said so.

(Exhibit, J-19).

The "counties serviced" language was addressed during negotiations, though the parties differ on what the language means.  In an April 18, 1997 letter, Alpert raised the following as a "significant discussion point":

> Upon the consummation . . . of a Major Transaction, the successor company will not be prohibited from opening or consolidating offices in counties in which the acquired company operated; likewise, any national division referrals on properties in those same counties will be excluded from Lawyer's Title referral commitment to the LLC.

(Exhibit, J-12).  Thus was born the "serviced counties" exclusion, which found its way into the next draft of the Operating Agreement.  There is no question that all parties involved read the provision prior to signing the final version of the Operating Agreement, but the parties differ on the context and meaning of the exclusion.  Thus, the "counties serviced" exclusion forms the crux of this dispute.

### E. The Sale of the Company and Assignment of Claims

On October 31, 2002, and before LTIC and the Company resolved its allocation dispute, LTIC, Gross and Meyer signed an Acquisition Agreement, selling their interests in the Company

to Valley National Bank ("Valley"). (Exhibit, J-22). However, in light of the ongoing dispute, the parties "agreed to disagree" and worked out an assignment of any claims arising out of the disputed interpretation of section 5.3. (Meyer Redirect, 196:12-25). Through the Assignment, Meyer and Gross preserved their rights to pursue the claim that LTIC had failed to honor its contractual obligations with respect to the allocation of national division business to the Company. (Exhibit, J-23). Specifically, the Company assigned "the right to bring a claim against LTIC with respect to the alleged breach . . . provided, however, that in the event of any recovery against LTIC with respect to such claim . . . LTIC has a right to fifty (50%) percent of the proceeds . . . ." (*Id.*). The Assignment was signed by Alpert on behalf of LTIC, Meyer as President of NIA, Meyer as President of the Company, and Gross and Meyer in their individual capacities. (*Id.*).

As part of the acquisition, Valley also agreed to assign any outstanding claims the Company might have against LTIC with respect to section 5.3(a) of the Operating Agreement. (*Id.*). The language of the assignment is located in Section 2.5 of the Acquisition Agreement:

> Buyer acknowledges and agrees that it is not receiving from the Company any claim that the Company has against Lawyers Title with respect to Section 5.3(a) of the Operating Agreement (the "Claim), which Claim Buyer acknowledges and agrees has been assigned prior to or simultaneously with the Closing by the Company to the Shareholders [Plaintiffs].

(*Id.*).

LTIC refutes the validity of the assignment in light of the Operating Agreement, which identified a formal procedure under which to execute an assignment of a claim. Section 4.2(a)(i) of the Operating Agreement provided for four directors of the company, two from NIA and two from LTIC. (Exhibit, J-3). At the time the Company was sold to Valley, the directors were

11

Gross and Meyer from NIA, and Alpert and Wiegel from LTIC. (*Id.*). Section 4.2(a)(ii) set forth several management decisions that required "the unanimous vote of all the Directors," including, under subparagraph F, "any assignment, pledge, transfer, release or compromise of debts owing to, or claims of, the Company . . . during any one Fiscal Year having an aggregate value in excess of $200,000." (*Id.*). According to section 4.2(b)(ii), a vote could either be cast by the Director in person or by signed, written proxy. (*Id.*). In examining the Assignment of Claims in this case, it was clearly not signed by all four directors.

      F.    **Facts Relevant to Damages**

During the existence of the Company, from July 1, 1997 through October 31, 2002, the national division business sent to New Jersey from LTIC, Commonwealth, Transnation and LandAmerica, totaled $29,261,026. (Exhibit, J-1). The premiums received by NIA/Lawyers Title during that same period totaled $5,461,308. (Exhibit, J-2). The Company was entitled to 43.275% of LTIC's New Jersey National Division Business. LTIC was then entitled to a 50% split on national business as an underwriting fee. (Meyer Direct, 124:15-20). The Company's damages must be further reduced to account for overhead costs. Meyer testified at trial that a 10% reduction for overhead was appropriate. (Meyer Direct, 133:8-10). He testified at his deposition, however, that had the Company received the business it was supposed to receive, it would have been subject to a 20% overhead rate. (Meyer Cross, 180:9-15). Alpert testified on behalf of LTIC that based on her forty years of experience in the industry, national division business, typically involving commercial properties, yielded a 30% profit margin (i.e., 70% overhead). (Alpert Direct, 317:18-318:4). After the reduction for overhead, the final damage number attributed to Plaintiffs is to be reduced by 50% to account for LTIC's share in

NIA/Lawyers Title.

## II.     CONCLUSIONS OF LAW

The legal issues central to this dispute are as follows: 1) whether there was a valid assignment, thus giving Plaintiffs standing to bring this lawsuit, 2) whether LTIC breached section 5.3 of the Operating Agreement by failing to properly allocate its New Jersey National Division Business to the LLC, and 3) if LTIC did breach the agreement, to determine the appropriate measure of damages.

### A.     Plaintiffs Have Standing Based on Valid Assignment

LTIC argues that the assignment is invalid for lack of unanimous consent of the four directors.  Defendant argued that the Assignment of Claim contains the signatures of only three directors and, moreover Gross and Meyer did not sign in their capacities as "directors."  LTIC argues that an invalidity of the Assignment is fatal to the claims in the complaint because the Plaintiff's lack standing to bring them.

The Court finds this position disingenuous.  Alpert, as President of LTIC, signed the Acquisition Agreement and Assignment on behalf of LTIC, intending to bind LTIC.  (Alpert Cross, 355:22-357:9).  No one suggested a Board of Directors meeting, nor did anyone believe that Alpert's signature would not be sufficient to represent LTIC's interest in the Company.  (*Id.*; Meyer Direct, 119:24-120:4).  In fact, despite the voting requirement set forth in the Operating Agreement, in the five plus years that the LLC was in operation, the Directors never convened a face-to-face board meeting or conducted a vote.  (Meyer Direct, 115:18-23; Alpert Cross, 355:11-21; Wiegel Cross, 380:15-21).  The other purported director, Wiegel, had no involvement with the LLC, was not aware of the sale to Valley, and was not even aware he was still a director

at the time of the assignment. (Weigel Cross, 379:25-380:8). Wiegel did not learn of the assignment until the commencement of this litigation, yet he still never registered a protest to the LLC acting in supposed violation of the Operating Agreement. (Weigel Cross, 381:15-382:1). Moreover, the fact that Weigel worked in the same office as Alpert and had a good working relationship with her, yet was ignorant to the sale and assignment, makes clear that Alpert was the sole representative of LTIC's interest in the LLC. (Weigel Cross, 381:1-382:14).

Alpert executed the Assignment, necessary to the sale of the LLC, yet LTIC now seeks to repudiate it for the sole purpose of thwarting the very claims it permitted Meyer and Gross to preserve. Clearly, the parties failed to adhere to the formalities of corporate management set forth in the Operating Agreement, and it would be an injustice for those formalities to be enforced now.[6] Surely, Alpert and Plaintiffs would have obtained Weigel's signature if they believed it necessary. Accordingly, LTIC is estopped from challenging the assignment.

The Court further notes the lack of good faith in the pursuit of this defense. Alpert testified that she offered to submit the dispute to binding arbitration, but Plaintiffs declined and chose to file this lawsuit. Alpert took offense, and stated on direct testimony, "if that's how they want to go after this, then we should look for whatever defenses we have under what happened." (Alpert Direct, 323:14-21). That included pursuing this technical defense to the validity of the assignment, the same assignment that she herself negotiated and signed, and the same assignment that she did not object to until after this litigation began. The parties negotiated the assignment

---

[6]Aside from the lack of Board Meetings or votes by the Directors, other aspects of the LLC were disregarded. For instance, the Company did not receive any section 5.3(c) certifications, nor is there any evidence that LTIC followed the procedures set forth in 5.1(d)(i) following consummation of a Major Transaction Opportunity.

of the claim in anticipation of further litigation, and LTIC cannot now argue that those negotiations and that agreement are ineffective. (Meyer Direct, 135:23-136:6).

   B.   **Interpreting Section 5.3 - The Allocation Problem**

This lawsuit concerns whether LTIC breached Section 5.3 of the Operating Agreement, which deals with the obligation of LTIC to allocate a percentage of "New Jersey National Division Business" to the LLC. In accordance with section 12.4(a) of the Operating Agreement, the Court must apply New Jersey law. (Exhibit, J-3).

The polestar of contract interpretation is the intent of the parties. *Atlantic Northern Airlines v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953). Under New Jersey law, where the terms of a contract are clear, it must be enforced as written. *County of Morris v. Fauver*, 707 A.2d 958, 969 (N.J. 1998). Where the contract is ambiguous, however, "courts will consider the parties' practical construction as evidence of their intention and as controlling weight in determining a contract's interpretation . . . ." *Fauver*, 707 A.2d at 969. When interpreting a contract,

> a court must not focus on an isolated phrase but should read the contract as a whole as well as considering the surrounding circumstances. Additionally, the conduct of the parties after execution of the contract is entitled to great weight in determining its meaning. Furthermore, an agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. Moreover, a subsidiary provision should not be interpreted in such a manner as to conflict with the obvious or dominant purpose of the contract.

*Wheatly v. Sook Suh*, 525 A.2d 340, 344 (N.J. Super. App. Div. 1987) (internal citations and quotations omitted); *see also Newark Publishers' Ass'n v. Newark Typographical Union No. 103*, 126 A.2d 348, 352-53 (N.J. 1956).

In the case at bar, the parties do not dispute that LTIC agreed to allocate 75% of its share of New Jersey National Division Business to the LLC, and after the Commonwealth acquisition,

LTIC had an obligation to refer 75% of its 57.7% share, or 43.275% of the combined national division business, to the Company.[7] LTIC argues that it could decrease the referral obligation beyond the 43.275% by virtue of the "counties serviced" exclusion, embodied in the second sentence of section 5.3 of the Operating Agreement. The provision reads: "New Jersey National Division Business shall be deemed not to include the performance of title services and the issuance of title insurance policies for properties located in counties serviced by LTIC Acquired Direct Business Operations." (Exhibit, J-3). Defendant believes this language would allow them to exclude from its referral obligation any national business directed to the twelve "counties serviced" by Commonwealth offices during the term of the Operating Agreement. (Alpert Direct, 306:12-21). Defendant defined "counties serviced" as the seven counties where Commonwealth had physical offices and five more "in which those offices advertised, solicited, and did substantial business on a daily basis." (Defendant's Proposed Findings of Fact and Conclusions of Law, 28-29).

The Court disagrees with Defendant's interpretation of the "counties serviced" exclusion. Section 5.3(a)(ii) already results in the exclusion of Commonwealth national business from the equation. Under LTIC's interpretation, the Company would be entitled to zero percent of LTIC's New Jersey National Division Business that is referred to "counties serviced" by Commonwealth, and just 43.275% of New Jersey National Division Business that is referred to counties not serviced by Commonwealth. Such a result would confer upon LTIC a benefit that

---

[7]Under 5.3(a)(i) and 5.3(a)(iii), if after the Commonwealth acquisition, LTIC and Commonwealth combined their direct operations in New Jersey, the LLC would be entitled to 75% of the total national division business. However, because the direct operations were not combined, 5.3(a)(ii) applies.

was not contemplated between the parties, and it would for all practical purposes invalidate that aspect of the agreement whereby LTIC agreed to a 75% referral of its post-acquisition share of New Jersey National Division Business. Accepting LTIC's definition, if Commonwealth's New Jersey offices begun to "service" more and more counties, eventually LTIC could make the argument that Commonwealth serviced all counties, and it no longer had *any* referral obligation to the LLC. Because the referral obligation was NIA's primary reason for entering into the LLC, to adopt this view of the "counties serviced" exclusion would negate the parties' original intent.[8]

Rather, the Court agrees with Plaintiffs' interpretation of the "counties serviced" exclusion. Plaintiffs believed the exclusion related to section 5.1(d), and was intended to mean that if LTIC offered an "Acquired Direct Business Operation" (i.e., Commonwealth's New Jersey offices) to NIA/Lawyers Title, and the LLC decided not to acquire the offices, then those offices were free to compete with the LLC and all national division business directed to those offices would be excluded from the allocation formula. (Gross Direct, 221:11-223:8). Section 5.1(d) reflects the agreement of the parties with respect to a Major Transaction Opportunity such as the Commonwealth transaction. Section 5.1(d)(iii) provides that "LTIC shall not consolidate LTIC Acquired Direct Business Operations with other LTIC operations in the State of New Jersey or operate them as LTIC direct operations, without first offering such LTIC Acquired Direct Business Operations to the Company to be purchased by the Company . . . ." (*Id.*). But if the

---

[8]The parties introduced evidence at trial regarding the negotiation and development of the Operating Agreement and, specifically, the "counties serviced" exclusion. Having considered this evidence, including testimony and the drafting history of the Operating Agreement, the Court does not find it helpful in resolving this particular dispute and will interpret the meaning of the exclusion in a manner consistent with the intent of the parties and the language of the agreement, taken as a whole.

LTIC Acquired Direct Business Operation is offered to the Company, and the Board of Directors decided not to acquire those operations, then it becomes a "LTIC Non-Acquired Direct Business Operation," and LTIC may continue to operate the business outside the scope of the Operating Agreement and in competition with the Company. (Exhibit J-3, at 5.1(d)(ii)). Thus, business referred to a county in which LTIC could compete through a Non-Acquired Direct Business Operation would be excluded from the referral obligation. The Court believes that this is the only reasonable interpretation of the "counties serviced" exclusion. Otherwise, there would be no purpose in distinguishing between LTIC Acquired Direct Business Operations and LTIC Non-Acquired Direct Business Operations, if both could be excluded from the referral obligation.

      The language of the contract as a whole and the intent of the parties support the conclusion that Defendant's position is a post-hoc justification for its failure to properly allocate business to the LLC. By funneling business through local Commonwealth offices, LTIC essentially did an end run around its referral obligation to the Company. However, the intent of the parties behind section 5.3 is clear. Plaintiffs, on behalf of NIA, sought to guarantee a stream of national division business; without that guarantee Plaintiffs would not have reached the agreement. (Gross Direct, 213:7-14). Defendants agreed to refer 75% of its New Jersey National Division Business, but did not want the LLC to experience a windfall should LTIC acquire another national insurance underwriter. Therefore, LTIC only had to refer 75% of *its share* of national division business, to the exclusion of national business generated by any company it might acquire during the life of the Operating Agreement. Those competing interests are embodied in the allocation formula set forth in section 5.3(a)(ii).

      The conduct of the parties post-agreement also suggests that LTIC's invocation of the

"counties serviced" exclusion was nothing more than a post-hoc justification for withholding premiums from the LLC. *Wheatly*, 525 A.2d at 344. LTIC failed to assert its right to exclude counties from the allocation formula after the Commonwealth transaction. If LTIC intended to utilize the "counties serviced" exclusion, it would have become apparent through the quarterly allocation certificate required by section 5.3(c). LTIC filed no such certifications. In addition, LTIC continued to allocate to the Company national division business located in counties where Commonwealth "serviced." (Exhibit, J-2). It was not until November 2001, more than a year after Meyer first complained about the allocation problem, and three and a half years after the Commonwealth transaction, that LTIC finally took the position that it could exclude counties "serviced" by Commonwealth from the referral obligation. (Meyer Direct, 70:1-13, 86:14-22). As of December 2000, Meyer was not even aware of any particular counties that were being excluded.[9] (Meyer Direct, 71:4-11).

Accordingly, the Court finds that LTIC breached section 5.3 of the Operating Agreement by failing to allocate 43.275% of New Jersey National Division Business to NIA/Lawyers Title. LTIC should have allocated business to the LLC in accordance with section 5.3(a)(ii) of the Operating Agreement, and the damages will be determined based on that provision.

**C.    Damages**

The total amount of New Jersey National Division Business generated by LTIC and its affiliates, including Commonwealth, for the relevant time period of July 1, 1997 (inception of LLC) through October 31, 2002 (date of sale to Valley), was $29,261,026. (Exhibit, J-1).

---

[9]For instance, Commonwealth had an office in Bergen County, but Meyer testified the Company had received New Jersey National Division Business in Bergen County. (Meyer Direct, 71:4-11).

According to the formula set forth in section 5.3(a)(ii), the LLC should have been allocated 43.275%, or $12,662,709.  During that same time period, however, the LLC received only $5,461,308 in gross premiums.  (Exhibit J-2).  The difference is $7,201,401.

After a 50% reduction for LTIC's underwriting fee, the LLC is left with $3,600,700.50.

Next, the Court must factor in overhead costs.  Meyer testified in his deposition and in answers to interrogatories to operating at 20% overhead.  The Court views that figure with more credibility than the 10% figure he testified to at trial.  (Meyer Cross, 180:9-15).  The Court finds that Meyer's experience in operating a local agency supports his overhead calculation, and thus rejects Alpert's opinion that overhead on commercial business would be as high as 70%.  Therefore, relying on Meyer's testimony and applying a 20% reduction for overhead, the LLC's damages are reduced to $2,880,560.40.  Finally, attributing 50% of the damages to LTIC for its share of the LLC leaves the Plaintiffs with a total damage amount of $1,440,280.20.

### III. CONCLUSION

In accordance with the above, the Court finds for Plaintiffs in the amount of $1,440,280.20.  An appropriate Judgment follows.

s/ Joel A. Pisano
Dated: May 19, 2005                     JOEL A. PISANO, U.S.D.J.